**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| ROBERT MULLIN, individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>v.<br><br>STATE EMPLOYEES CREDIT UNION OF MARYLAND INC. d/b/a SECU,<br><br>          Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**Case No: 1:26-cv-01823** |

Plaintiff Robert Mullin ("Plaintiff"), on behalf of himself and all others similarly situated (the "Class Members"), asserts the following against Defendant State Employees Credit Union Of Maryland Inc. d/b/a SECU ("SECU" or "Defendant"), based upon personal knowledge and, where applicable, on information and belief through the investigation of counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all persons who have accessed and used https://www.secumd.org/ (the "Website") for financial services.

2.      Defendant provides a variety of personal and business financial services to consumers through the Website it maintains, including allowing consumers to apply for credit cards, loans, insurance, and bank accounts. To apply for one of Defendant's financial products or services, users must share personally identifying information. When consumers provide this information on their applications, they expect that such confidential information and activity will be protected and not disclosed to unknown third parties. Such expectations are based, in part, on the legal protections afforded to such information.

3.      Despite reasonable expectations of privacy and Defendant's legal duties to prevent

the disclosure of such private information, Defendant discloses information provided by consumers on financial applications to undisclosed third parties, including Google, LLC ("Google").  These disclosures include communications that contain sensitive and confidential information – i.e., "nonpublic personal information," as defined by 16 C.F.R. § 313.3 (the "Gramm-Leach-Bliley Act" or "GLBA").

4.      Through the acts alleged herein, Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. 2511, *et seq.* ("ECPA"), the Maryland Wiretapping and Electronic Surveillance Act, Md. Code, Cts. & Jud. Proc. Code Sec. 10-401, *et seq*., intrusion upon seclusion/invasion of privacy, and was unjustly enriched by disclosing Plaintiff's and Class Members' private and confidential information without consent.

5.      Defendant chose to implement Google's Tracking Technologies on its Website, which functioned to intercept and disclose private user interactions on the Website to Google, including confidential financial details and personally identifiable information ("PII") from Plaintiff and Class Members.

## PARTIES

6.      Plaintiff Robert Mullin is a resident and citizen of Middle River, Maryland. On or around April 7, 2026, Plaintiff applied for a loan through the Website.  Plaintiff applied for a loan through the Website using the same device and browser used to access his Google account. When creating his Google account, Plaintiff provided certain information to Google, including his full name. Unbeknownst to Plaintiff, Defendant disclosed his personally identifiable information ("PII") to Google—including communications that contained Plaintiff's confidential, "nonpublic personal information" as defined by the GLBA. Neither Defendant nor Google procured Plaintiff's prior consent to the sharing of his private and protected information.

7.    Defendant State Employees Credit Union Of Maryland Inc. is a Maryland Corporation with its principal place of business in Lutherville-Timonium, Maryland. Defendant is a provider of financial products and services including bank accounts, credit cards, and loans, to individuals throughout the United States, focusing primarily on individuals with a connection to Maryland. Defendant also provides a variety of financial services to Marylanders, whom it knows to reside in the State based on address information that individuals must provide in order to open an account or apply for a financial product or service with SECU. Defendant chose to embed the Google Tracking Technologies on its Website, which it owns and operates.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the defendant.

9.    This Court has personal jurisdiction over the parties because both Plaintiff and Defendant reside in Maryland.  Further, the Defendant has, at all times relevant hereto, systematically and continually conducted business in Maryland, including within this District, and intentionally availed itself of the benefits and privileges of the Maryland consumer market through the promotion, marketing, and operation of its services to residents within this District and throughout Maryland. Additionally, Plaintiff, while in Maryland, applied for a loan through Defendant's Website.

10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District.

## FACTUAL BACKGROUND

### I.    The Maryland Wiretap Act and the ECPA

11.    Maryland's Wiretap Act prohibits: (a) the interception or procurement of another to intercept any wire, electronic or oral communication; (b) the intentional disclosure of the contents of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic or oral communication; and (c) the intentional use of the contents of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic or oral communication.  Md. Code, Cts. & Jud. Proc. § 10-402.

12.    "Intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device."  Md. Cts. & Jud. Proc. Code § 10-401(10).

13.    "Contents" is defined as "used with respect to any wire, electronic or oral communication, includes any information concerning the identity of the parties to the communication or the existence, substance, purport, or meaning of that communication."  Md. Cts. & Jud. Proc. Code § 10-401(4).

14.    "Person" is defined as "any individual, partnership, association, joint stock company, trust or corporation."  Md. Cts. & Jud. Proc. Code § 10-401(14).

15.    "Electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system."  Md. Cts. & Jud. Proc. Code § 10-401(5)(i).

16.     The Maryland Wiretap Act applies unless "***all*** of the parties to the communication have given prior consent." Md. Code, Cts. & Jud. Proc. § 10-402 (emphasis added).

17.     Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose or use, a wire, electronic, or oral communication in violation of the Maryland's Wiretap Act is subject to a civil action for: (a) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs incurred. Md. Code, Cts. & Jud. Proc. § 10-410.

18.     The ECPA and the Maryland Wiretap largely mirror one another with one key distinction: the Maryland Wiretap Act is an all-party consent statute, whereas the ECPA is a one-party consent statute.

19.     Although the ECPA does not apply "where one of the parties to the communication has given consent[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[1]

## II.    The Gramm-Leach-Bliley Act Protects Consumers' Financial Information

20.     Congress recognized, "nonpublic personal information" is confidential.

21.     Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

   (i)     Personally identifiable financial information; and

   (ii)    Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

---

[1] 18 U.S.C. § 2511(d)

22.   Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

(i)   A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

(ii)  About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

(iii) [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—(i) Information included. Personally identifiable financial information includes:

(A)   Information a consumer provides to [a financial institution]on an application to obtain a loan, credit card, or other financial product or service;

(B)   Account balance information, payment history, overdraft history, and credit or debit card purchase information;

(C)   The fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution];

(D)   Any information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer;

(E)   Any information that a consumer provides to [a financial institution] or that [a financial institution]or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and

(F)   Any information [a financial institution] collect[s] through an Internet "cookie" (an information collecting device from a web server).

23.   Pursuant to 16 C.F.R. § 313.3(k)(1):

a financial institution "means any institution the business of which is engaging in an activity that is financial in nature or incidental to such financial activities as described in section 4(k) of the Bank Holding

6

Company Act of 1956, 12 U.S.C. 1843(k). An institution that is significantly engaged in financial activities, or significantly engaged in activities incidental to such financial activities, is a financial institution."

24.    Pursuant to 16 C.F.R. § 313.3(k)(1), SECU is a financial institution.

**III.    Consumers Have A Financial Stake In Companies' Promises Relating To Their Data Privacy**

25.    "In an era where every click, tap or keystroke leaves a digital trail, Americans remain uneasy and uncertain about their personal data and feel they have little control over how it's used."[2]

26.    "The value of consumer data often comes from identifying users and combining their data from various sources.  This is possible, in part, through the ubiquity of personally identifiable information (PII) and unique identifiers, as well as identifying individuals from non-PII, such as aggregated or anonymized data.  The ability to identify users enables website and app operators to combine data and track user activity across devices."[3]

27.    "Advertisers, as well as website and app operators, have incentives to improve their ad targeting by collecting detailed information about each user.  Advertisers might expect more precise targeting to increase sales.  Websites' revenue may depend on how frequently users click on the ad or how much time users spend viewing the ad."[4]

28.    With increased surveillance of consumers' purchase patterns, consumer concern over the control of their data privacy has continued to grow:

- "86% of Americans are more concerned about their privacy and data security

---

[2] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER (October 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/

[3] CLARE Y. CHO & LING ZHU, CONG. RSCH. SERV., R47298, *Online Consumer Data Collection and Data Privacy*, (October 31, 2022), https://www.congress.gov/crs-product/R47298.

[4] Clare Y. Cho, CONG. RSCH. SERV., IF11448, *How Consumer Data Affects Competition Through Digital Advertising*, (January 26, 2023), https://www.congress.gov/crs-product/IF11448.

than the state of the U.S. economy – but two-thirds either don't know or are misinformed about how their data is being used and who has access to their privacy"[5]

- "67% of respondents don't understand what data privacy means or how their data is being used"[6]
- The public increasingly says they don't understand what companies are doing with their data. Some 67% say they understand little to nothing about what companies are doing with their personal data, up from 59%[7]
- 72% of Americans say there should be more [government] regulation than there is now; just 7% say there should be less. [8]
- Roughly four-in-ten Americans say they are *very* worried about companies selling their information to others without them knowing (42%) or people stealing their identity or personal information (38%).[9]
- 81% say they feel very or somewhat concerned with how companies use the data they collect about them. [10]
- People don't feel in control: Roughly three-quarters or more feel they have very little or no control over the data collected about them by companies (73%)[11]
- 36% strongly agree or somewhat agree they're in control of personal data. A third (29%) were concerned about how retailers and e-commerce companies use consumer data.[12]
- An overwhelming majority (85%) of consumers are taking at least one step to address their privacy and security concerns. However, 75% feel they should be doing more, and many indicate they feel a sense of powerlessness: They believe that companies can track them no matter what they do (26%), don't know what actions they can take (25%), and think hackers can access their data no matter

---

[5] Gary Drenik, *Data Privacy Tops Concerns For Americans – Who Is Responsible For Better Data Protections?*, FORBES, (Dec. 8, 2023), https://www.forbes.com/sites/garydrenik/2023/12/08/data-privacy-tops-concerns-for-americans--who-is-responsible-for-better-data-protections/.

[6] *Id.*

[7] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER, (Oct. 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/.

[8] *Id.*

[9] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *Views of data privacy risks, personal data and digital privacy laws*, PEW RESEARCH CENTER, (Oct. 18, 2023) https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/.

[10] *Id.*

[11] *Id.*

[12] *Survey Shows Consumers Concerned About Personal Data, Privacy and Internet Safety for Children,* KINETIC, (Jan. 24, 2025), https://www.windstream.com/blog/consumer-data-privacy-survey-2025.

what they do (21%).[13]

29.    This concern over data privacy also impacts consumer behavior:

- 79% of Americans are concerned about how companies use their data.[14]
- 75% of Americans believe there should be more regulations to protect their privacy from companies collecting consumer data without their consent or knowledge. [15]
- 60% of users say they would spend more money with a brand they trust to handle their personal data responsibly.[16]
- 52% of American users chose not to use a product or service due to worries about how much personal data would be collected about them.[17]
- 48% of users have stopped buying from a company over privacy concerns.[18]
- 33% of users have terminated relationships with companies over data. They left social media companies, ISPs, retailers, credit card providers, and banks or financial institutions.[19]
- 81% of users say the potential risks they face from companies collecting data outweigh the benefits[20]

---

[13] *New Deloitte Survey: Increasing Consumer Privacy and Security Concerns in the Generative AI Era*, DELOITTE, (Dec. 2, 2024), https://www.deloitte.com/us/en/about/press-room/increasing-consumer-privacy-and-security-concerns-in-the-generative-ai-era.html.

[14] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019).
https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[15] Branka Vuleta, *18 Chilling Privacy Statistics in 2023*, LEGALJOBS (Jul. 22, 2025), https://legaljobs.io/blog/privacy-statistics.

[16] *Global Consumer State of Mind Report 2021,* TRUATA, https://www.truata.com/resources/report/global-consumer-state-of-mind-report-2021/.

[17] Andrew Perrin, *Half of Americans have decided not to use a product or service because of privacy concerns*, PEW RESEARCH CENTER, (Apr. 14, 2020) https://www.pewresearch.org/short-reads/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/.

[18] Ratnesh Pandey, *Staying Cyber-Secure While Working From Home*, TABLEAU, (updated Jul. 18, 2024) https://public.tableau.com/app/profile/ratnesh2928/viz/Stayingcyber-securewhileworkingfromhome/Stayingcyber-securewhileworkingfromhome/.

[19] *Consumer Privacy Survey*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-cybersecurity-series-2021-cps.pdf.

[20] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019),

IV. **Defendant Discloses Consumers' Private Information Through Google's Tracking Technologies**

   A. **Function of the Tracking Technologies**

30.     Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications.  Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

31.     Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

32.     Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- HTTP Request: an electronic communication sent from a device's browser to the website's server.  GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers.  Cookies are sent with HTTP Requests from devices to the host server.  Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

33.     A consumers' HTTP Request essentially asks the website to retrieve certain

https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

10

information (such as payment submissions and user selections), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

34.    Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

35.    Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

36.    The Google Tracking Technologies embedded and configured on the Website by Defendant constitute Source Code.

**B. Google's Tracking Technologies**

37.    Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

38.    Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[21] In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Table 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|------|---------------|------------|--------------|

---

[21] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

| 2021 | $257.6 billion | $209.5 billion | 81.33% |
|------|----------------|----------------|--------|
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

39.     Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

40.     One of these SDKs and tracking pixels is Google Analytics.  Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

41.     Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior.  Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices." [22]

---

[22] *About the User-ID feature*, GOOGLE,
https://support.google.com/analytics/answer/3123662#zippy=%2Cin-this-article.

42. In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

43. Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

44. Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms." [23] It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[24]

45. Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site—even when users are logged into their account portals. This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on. The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or users) is using to access a website. The device information intercepted by Google includes the user's operating system, operating system version, browser, language, and screen resolution.

46. In other words, when interacting with the Website, an HTTP Request is sent to

---

[23] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/.
[24] *Id.*

Defendant's server, and that server sends an HTTP Response including the Markup that displays the website visible to the user and Source Code, including Google's tracking technologies.

47.     Thus, Defendant is essentially handing its users a tapped device, and once the Webpage is loaded onto the users' browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the tap, which intercepts those communications intended only for the Defendant and transmits those communications to Google.

48.     Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google for processing.  Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters.  Once the data is processed, it is stored on a Google database and cannot be changed.

49.     After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages.  These include reports on acquisition (*e.g.*, information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (*e.g.*, measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (*e.g.*, classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

50.     In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

51.     The Website utilizes Google's pixel and SDK.  As a result, Google intercepted users' interactions on the Website, including their PII.  Google received at least "Custom Events"

and URLs that disclosed the products purchased by the user.  Google also received additional PII, including but not limited to the users' IP address, device information, and User-IDs by matching IP addresses, device information, and User-IDs it intercepts and linking such information to an individual's specific identity.

52.    For example, the Website utilizes Google's "cid" or "Client ID" function to identify users as they navigate the Website.

53.    Similarly, Google also utilizes the "auid" or "Advertiser User ID," and "guid" or "Globally Unique Identifier," parameters to identify unique users and unique interactions with a website Defendant sent these identifiers with each consumer's "event" data.

54.    In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers.  A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

55.    These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden, or cookies are blocked, and can provide a wide variety of data.

56.    As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[25]

57.    The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it

---

[25] Justin Schuh, *Building A More Private Web*, GOOGLE, https://blog.google/products-and-platforms/products/chrome/building-a-more-private-web/.

employs much more subtle techniques.  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

58.    In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[26]

59.    Browser-fingerprints are personal identifiers.  Tracking technologies, like the ones developed by Google and utilized on the Website, can collect browser-fingerprints from website visitors.

60.    As enabled by Defendant, Google collects vast quantities of consumer data through its Tracking Technologies.

61.    Due to the vast network of consumer information held by Google, matches the IP addresses, device information, User-IDs, and hashed versions of its account holders phone numbers and email addresses it intercepts and links such information to an individual's specific identity.

62.    Google then utilizes such information for its own purposes, such as targeted advertising.

63.    Google Analytics also links with Google Ads, allowing the data intercepted through Google Analytics to be utilized for targeted advertising purposes.[27]  Such practices were in effect on the Website for targeted advertising purposes.

64.    The DoubleClick API "is an integrated ad technology platform that enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."

---

[26] *New reliable technique to track web users across browsers*, SCIENCEDAILY, https://www.sciencedaily.com/releases/2017/02/170213131447.htm.

[27] https://support.google.com/analytics/answer/9379420?hl=en#zippy=%2Cin-this-article.

16

65.    DoubleClick was acquired by Google in 2008.  In 2018, the DoubleClick API was integrated with the Google Analytics API into the Google Marketing Platform.[28]  The Google Marketing Platform makes use of most of DoubleClick's features, albeit under different brand names: for example, "DoubleClick Bid Manager is now Display & Video 360," "DoubleClick Search is now named Search Ads 360," and DoubleClick Campaign Manager and DoubleClick Studio are now named Campaign Manager and Studio, respectively."[29]

66.    As relevant here, however, data is still sent from the Website to Google through the DoubleClick API, and app developers like Defendant can then use the Google Marketing Platform to manage the data.

67.    Once integrated into a developer's mobile application, the DoubleClick API allows an app developer to, among other features, analyze and optimize marketing campaigns and conduct targeted advertising. [30]

68.    Once Defendant intercepts the Website communications through the DoubleClick API and discloses such information to Google (in real time), Google has the capability to use such information for its own purposes.  "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps." [31]

69.    Google also encodes the user's email address, to match it to its own records.

---

[28] Brad Bender, *Introducing Google Marketing Platform*, GOOGLE MARKETING PLATFORM (June 27, 2018), https://www.blog.google/products/marketingplatform/360/introducing-google-marketing-platform/.

[29] *Introducing Google Marketing Platform*, GOOGLE, https://support.google.com/displayvideo/answer/9015629?hl=en.

[30] *DoubleClick Digital Marketing*, GOOGLE, https://support.google.com/faqs/answer/2727482.

[31] *Privacy and Terms*, GOOGLE, https://policies.google.com/technologies/partner-sites.

70.    Google's range of SaaS services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites and then analyzing that information to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

71.    Information from websites, like Defendant's Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

72.    In sum, Google uses website communications to: (i) improve its own products and services; (ii) develop new Google for Business and Google Analytics products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

73.    Google views and processes every piece of information collected from the DoubleClick API, including the information collected from Defendant's Website, and uses it to assist with data analytics, marketing, and targeted advertising.

74.    Google partners with Defendant in its marketing efforts.  Google's tracking technologies, including Google Analytics, browser fingerprinting, and Google DoubleClick are employed on the Website in the manner described throughout this Complaint.

75.    Plaintiff did not consent to the interception or disclosure of his data to Google. Defendant's disclosure, and Google's interception, of Plaintiff's and prospective class members' PII without their consent is an invasion of privacy in violation of the ECPA (18 U.S.C. §2511, *et seq.*), the Maryland Wiretap Act (Md. Code, Cts. & Jud. Proc. Code Sec. 10-401, *et seq.*), common law intrusion upon seclusion/invasion of privacy, and unjust enrichment.

### C.  Defendant's Use of Google's Tracking Technologies

76.    Pursuant  to  agreements  with  third  parties,  including  Google,  Defendant

18

intentionally and voluntarily embedded the Tracking Technologies on the Website. As illustrated within this section, Defendant unlawfully disclosed personally identifiable information and consumer financial information to Google through Tracking Technologies, without customer consent, and contrary to its express warranties.

77. The Tracking Technologies are Source Code that do just that—they surreptitiously transmit a Website User's communications and inputs to the corresponding user IDs, much like a traditional wiretap.

78. Thus, Defendant is, in essence, handing its customers a tapped website and, once a webpage is loaded into the user's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Tracking Technologies, which then intercept those communications—intended only for Defendant—and instantaneously transmit those communications to Google or other third parties.

79. For example, when individuals visit Defendant's Website via an HTTP request to Defendant's server, Defendant's server sends an HTTP response (including the Markup) that displays the webpage visible to the User, along with Source Code (including the Tracking Technologies).

80. Third parties—including Google —offer companies, including Defendant, snippets of code they can install in web browsers of users accessing their services. These code snippets uniquely identify the user and are sent with each intercepted communication to ensure the third party can identify the specific user associated with the information intercepted (in this case, confidential PII and financial information).

81. Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website

19

(their IP addresses, User-IDs, cookie identifiers, device identifiers, etc.) and the "content" of these communications (the buttons, links, pages, and tabs they click, as well as the financial information they put in while seeking financial services from Defendant).

82.     Defendant installs these Tracking Technologies despite its understanding that its consumers' reasonably anticipate their identifiable information to be kept confidential and undisclosed to Third Parties.

83.     When users access the Website, Defendant discloses the URLs and page titles of every page that they visit, including during the application process.  The URLs and page titles disclose what type of financial service the user is seeking to purchase.  For example, when a consumer fills out a loan application, Defendant intercepts and discloses information about the financial service, with Google as enabled by Defendant.  Google also receives consumers' personally identifiable information in the form of a user IDs (the 'cid' and 'auid' values), browser fingerprints, and encoded email.  *See e.g*. Figs. 1–3.

84.     An example illustrates the point.  Take, for example, when a user navigates the Website for a personal loan.  Defendant intercepts and discloses they are beginning a loan application via the 'form_start event.' Fig. 1



**Figure 1**

85.     Defendant also intercepts discloses the type of loan or credit the consumer is seeking, the purpose for the loan, the loan term, and the loan amount.  Fig, 2.



**Figure 2**

86.    As the consumer continues to progress through the financial service application process, they are prompted to enter detailed personal information.  Defendant intercepts and discloses various financial information and personally identifiable information (i.e. user email, cid, and auid parameter) to Google through Google's Tracking Technologies.  Google associates all this information with its unique identifiers and various tracking cookies.  The consumer's email is also intercepted in an encoded format, which Google can decode.  *See* Fig. 3

//

//

//

//

//



| gtm | 45be64s1v892584623za20gzb6617963zd6617963xec |
|---|---|
| gcd | 13l3l3l3l1l1 |
| dma | 0 |
| tag_exp | 0~115938465~115938469~117266401~118289195~118463261 |
| rcb | 1 |
| npa | 0 |
| frm | 0 |
| ae | a |
| pscdl | noapi |
| auid | 1100007427.1777556008 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%2520Chrome%3B147.0.7727.137%7CNot.A%252FBrand%3B8.0.0.0%7CChromium%3B147.0.7727.137 |
| uamb | 0 |
| uam | |
| uap | Windows |
| uapv | 19.0.0 |
| uaw | 0 |
| ec_mode | a |
| em | tv.1~em.XZwq3TlQcezvKEi559zeqZvo08ZXz8Rie5NCLwtirUA |
| ecsid | 1197058635.1777556305 |

Encoded Email

**Figure 3**

87.    Plaintiff applied for a loan on Defendant's Website in a manner substantially identical to that described throughout.

### D.  Defendant Did Not Anonymize Consumer Data By Disclosing Hashed and Encoded Values To Third Parties

88.    The Federal Trade Commission routinely evaluates privacy representations by companies.  When it comes to hashing the FTC has said the following:

> Companies often claim and act as if data that lacks clearly identifying information is anonymous, but data is only anonymous when it can never be associated back to a person. If data can be used to uniquely identify or target a user, it can still cause that person harm.
>
> One way that companies obscure personal data is through "hashing." Hashing involves taking a piece of data—like an email address, a phone number, or a user ID—and using math to turn it into a number (called a hash) in a consistent way: the same input data will always

23

> create the same hash.
>
> . . .
>
> This logic is as old as it is flawed – hashes aren't "anonymous" and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized. FTC staff will remain vigilant to ensure companies are following the law and take action when the privacy claims they make are deceptive.[32]

89.    Thus, through the Tracking Technologies provided by the Google, Defendant intercepted and disclosed Plaintiff and Class Members personally identifiable information regardless of whether it was hashed or in plain text.

## CLASS ACTION ALLEGATIONS

90.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

> **Nationwide Class:** All natural persons in the United States who, during the class period, accessed and used the Website to apply for or manage financial services.
>
> **Maryland Class:** All natural persons in the State of Maryland who, during the class period, accessed and used the Website to apply for or manage financial services.

91.    Plaintiff reserves the right to modify the Class definitions, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

92.    The following people are excluded from the Classes: (1) any Judge presiding over this action and members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this

---

[32] *No, hashing still doesn't make your data anonymous*, FEDERAL TRADE COMMISSION (Jul. 24, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous.

matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

93.    **Numerosity:** The number of persons within the Classes is substantial and believed to amount to hundred of thousands of persons.  It is, therefore, impractical to join each member of the Classes as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Classes render joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Classes are ascertainable and identifiable from Defendant's and Google's records.

94.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Classes and that predominate over any questions affecting only individual members of the Classes.  These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated the ECPA and the Maryland Wiretap Act, whether Defendant committed intrusion upon seclusion and/or invasion of privacy, whether Defendant was unjustly enriched, whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

95.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like all other class members, visited the Website and had his confidential electronic communications intercepted and disclosed to Google through Google's Tracking Technologies.

96.     **Adequate Representation:** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of members of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

97.     **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes.  Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2511, *et seq*.**
**(On Behalf Of The Nationwide Class)**

98.     Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

99.     Plaintiff brings this claim on behalf of himself and members of the Class.

100.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional

interception of the content of any electronic communication. 18 U.S.C. § 2511.

101.    The ECPA protects both sending and receipt of communications.

102.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

103.    The transmission of Plaintiff's PII and financial information to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

104.    The transmission of PII and financial information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

105.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

106.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

107.    The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]"  18 U.S.C. § 2510(5).

   a.  The following instruments constitute "devices" within the meaning of the ECPA:

   b.  The computer codes and programs Defendant and Google used to track Plaintiff

27

and Class Members communications while they were navigating the Website;

c.  Plaintiff's and Class Members' browsers;

d.  Plaintiff's and Class Members' mobile devices;

e.  Defendant's and Google's web and ad servers;

f.  The plan the Defendant and Google carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

g.  Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

108.  By utilizing and embedding the Tracking Technologies provided by Google on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

109.  Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technology provided by Google on its Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and financial information to Google.

110.  The Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII, including their identities and information related to the specific financial product or service they were applying for.  This confidential information is then monetized for targeted advertising purposes, among other things.

111.  By intentionally disclosing or endeavoring to disclose Plaintiff's and Class

28

Members' electronic communications to Google through the Google Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

112.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

113.    Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, the GLBA, among others.

114.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, Defendant violated a provision of the Gramm-Leach-Bliley Act, 16 C.F.R. § 313.  This provision imposes a criminal penalty for knowingly disclosing "nonpublic personal information" to a third party.  GLBA defines nonpublic personal information as:

> Any information that is not publicly available and that: a consumer provides a financial institution to obtain a financial product or service from the institution; results from a transaction between the consumer and the institution involving a financial product or service; or a financial institution otherwise obtains about a consumer in connection with providing a financial product or service.[33]

115.    Plaintiff's information that Defendant disclosed to Google qualifies as nonpublic

---

[33] 16 C.F.R. § 313

personal information (including information related to their citizenship, housing status, and employment), and Defendant violated Plaintiff's and Class Members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 16 C.F.R. § 313. Defendant specifically used the tracking technology provided by Google to track and utilize Plaintiff's and Class Members' PII for financial gain.

116.    Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

117.    Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy.  Plaintiff and Class Members, all of whom are users of the Website, had a reasonable expectation that Defendant would not redirect their communications to Google without their knowledge or consent.

118.    The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

119.    As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2511, *et seq*. under 18 U.S.C. § 2520.

### COUNT II
**Violation of the Maryland Wiretapping and Electronic Surveillance Act**
**Md. Code, Cts. & Jud. Proc. Code Sec. 10-401, *et seq*.**
**(On Behalf of the Maryland Subclass)**

120.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

121.    Plaintiff brings this claim against Defendant individually and on behalf of the Maryland Class.

122.    Maryland's Wiretapping and Electronic Surveillance Act ("MWESA") makes it

unlawful to: (1) willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; (2) willfully disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle; or (3) willfully use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication." Md. Cts. & Jud. Proc. Code Sec. 10-402.

123. Under the MWESA, "willfully" is defined as "an intentional violation or a reckless disregard of a known legal duty." *Benford v. Am. Broadcasting Co.*, 649 F. Supp. 9, 10 (D. Md. 1986).

124. "Electronic Communication" is defined as "[a]ny transfer of signals, writings, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." Md. Code. Cts. & Jud. Proc. Sec. 10-401(5)(i).

125. "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Md. Code Cts. & Jud. Proc. Sec. 10-401(4).

126. "Contents" is defined as "any information concerning the identity of the parties to the communication or the existence, substance, purport, or meaning of that communication." Md. Code Cts. & Jud. Proc. Sec. 10-401(7).

127. Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose or use, a wire, electronic, or oral communication in violation of Maryland's

Wiretap Act is subject to a civil action for: (a) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs incurred. Md. Cts. & Jud. Proc. Code § 10-410.

128. At all relevant times, Defendant procured Google to track and intercept Plaintiff's and Class members' internet communications while navigating the Website. They intercepted these communications without authorization and consent from Plaintiff and Class members.

129. Defendant, when procuring Google to intercept Plaintiff's communications, intended Google to learn the meaning of the content the visitor requested.

130. As alleged above, Google intercepted Plaintiff's and Maryland Class members' electronic communications, including information that contained sensitive and confidential financial information, including personally identifiable information.

131. Plaintiff's and Maryland Class members' electronic communications were intercepted in Maryland.

132. Defendant sought to profit and in fact did profit off the interception of Plaintiff's and the Maryland Class members' electronic communications while intentionally or recklessly disregarding its own legal duty.

133. The interception of Plaintiff's and Maryland Class members personally identifiable financial information constitutes an invasion of privacy sufficient to confer Article III standing.

134. Plaintiff and Maryland Class members seek all relief available under Md. Code Cts. & Jud. Proc. Secs. 10-410(a)(1)–(3), including statutory damages of $100 per day for each day or violation or $1,000, whichever is higher, punitive damages, and reasonable attorneys' fees

and costs.

### COUNT III
### Violation of Common Law Invasion of Privacy – Intrusion Upon Seclusion
### (On Behalf of the Maryland Subclass)

135.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

136.     Plaintiff brings this claim against Defendant individually and on behalf of the Maryland Class.

137.     Defendant's procurement of Google to intercept Plaintiff's and Class Members' information about their sensitive financial information constitutes an intentional intrusion upon Plaintiff's and Class Members' privacy, seclusion, and private affairs.  Defendant caused the interception of said information, which was intended to stay private, namely sensitive financial information, without users' consent.

138.     Plaintiff and Class Members had a reasonable expectation of privacy in their personally identifiable financial information.  Plaintiff's and Class Members' financial information is inherently sensitive in nature and protected by law.  Plaintiff and Class Members reasonably expected this information would remain private and confidential and would not be disclosed to third parties without their consent.

139.     There was no indication provided by Defendant that Google's Tracking Technologies were embedded on the Website or that it would intercept Plaintiff's and Class Members' sensitive financial information when they interacted with the Website.

140.     Plaintiff and Class Members did not consent to, authorize, or know about Defendant's intrusion at the time it occurred.  Accordingly, Plaintiff and Class Members never agreed that Defendant could intercept their data or cause the interception of their data on behalf of third parties.

141.    The surreptitious taking and disclosure of sensitive financial information, from thousands of individuals, was highly offensive because it violated expectations of privacy that have been established by social norms.

142.    Defendant decided to implement Google's Tracking Technologies on its Website knowing that it was procuring Google to intercept Plaintiff and Class Members' private communications with the Website.  Therefore, Defendant acted intentionally.

143.    The offensiveness of this conduct is even more apparent because Defendant's disclosure of this information was conducted in secret in a manner that Plaintiff and Class Members would be unable to detect through the seamless incorporation of Google's Tracking Technologies, which operates wholly behind the scenes while Plaintiff and Class members were interacting with the Website.

144.    Accordingly, Defendant's interception of Plaintiff's and Class members' sensitive financial information would be (and in fact is) highly offensive to a reasonable person.

145.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

146.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

147.    Plaintiff and Class Members seek appropriate relief for their injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant because of its intrusions upon Plaintiff's and Class Members' privacy.

148.    Plaintiff and Class Members are also entitled to punitive damages resulting from

the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

149.    Plaintiff also seeks such other relief as the Court may deem just and proper.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of the Maryland Subclass)**

150.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

151.    Plaintiff and Class Members conferred a benefit upon Defendant in the form of valuable personally identifiable financial information, which Defendant collected from Plaintiff and Class Members under the guise of keeping this information private.  Defendant voluntarily collected, used, and procured the interception of such information for its own gain, including advertisement purposes or sale.  Additionally, Plaintiff and Class Members conferred a benefit upon Defendant in the form of monetary compensation.

152.    Plaintiff and Class Members would not have used Defendant's services, or would have paid less for these services, if they had known Defendant would use and disclose this information.

153.    Defendant unjustly retained those benefits at the expense of Plaintiff and Class Members because Defendant's conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and Class Members.

154.    The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members.  It would be inequitable for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods,

acts, and trade practices alleged in this Complaint.

155.    Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the proposed Classes, respectfully requests that the Court enter an order:

a. Certifying this case as a Class action on behalf of the Classes defined above, appointing Plaintiff as the representative of the Classes, and appointing Plaintiff's counsel as the Class counsel;

b. Declaring that Defendant's conduct, as set out above, violates the laws cited herein;

c. Awarding damages, including nominal, statutory, and punitive damages where applicable, to Plaintiff and the Classes in an amount to be determined at trial;

d. Awarding Plaintiff and the Classes equitable relief including restitution and disgorgement of unlawfully obtained profits;

e. Awarding Plaintiff and the Classes their reasonable litigation expenses and attorneys' fees;

f. Awarding Plaintiff and the Classes pre-and post-judgment interest, to the extent allowable;

g. Awarding such other further injunctive and declaratory relief as is necessary to protect the interests of Plaintiff and the Classes; and

h. Awarding such other and further relief as the Court deems reasonable and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of himself and the proposed Classes, demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: May 8, 2026

*/s/ Nathaniel K. Risch*

**MANN & RISCH, LLC**
Nathaniel K. Risch
Fed. Bar No.: 28764
101 E. Chesapeake Ave., Ste. 403
Towson, MD 21286
Telephone: (410) 929-5145
Facsimile: (410) 307-1007
E-Mail: nate@mannrisch.com

**BURSOR & FISHER, P.A.**
Alec Leslie (*pro hac vice* forthcoming)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: aleslie@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*pro hac vice* forthcoming)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*Counsel for Plaintiff*